**SEKULOW et al. v. 11TH & F ST. VALET, Inc., et al.**

No. 9432.

United States Court of Appeals
District of Columbia.

Argued April 16, 1947.

Decided June 14, 1947.

Mr. Abram C. Joseph, of Baltimore, Md., of the Bar of the State of Maryland, pro hac vice, by special leave of Court, and Mr. Francis W. Hill, Jr., of Washington, D. C., for appellants. Mr. Gilbert J. Stern, of Baltimore, Md., of the Bar of the State of Maryland, pro hac vice, by special leave of Court, was allowed to appear for appellants. Mr. Augustus P. Crenshaw, III, of Washington, D. C., also entered an appearance for appellants.

Mr. Francis J. Kelly, of Washington, D. C., with whom Messrs. J. Louis O'Connor and James R. Reynolds, both of Washington, D. C., were on the brief, for appellees.

Before STEPHENS, CLARK and WILBUR K. MILLER, Associate Justices.

CLARK, Associate Justice.

Plaintiffs below appeal from the action of the District Court, sitting without a jury, entering judgment for defendants and ordering plaintiffs' cause dismissed. The action sought the cancellation of an existing lease, the reinstatement of a prior lease, and the recovery of rent and money paid as a result of alleged fraud and duress.

In July, 1942, appellants, who are engaged in the business of selling ladies' hats, entered into a lease agreement with appellee Valet, Inc., covering the first floor and basement of the premises 604 11th Street, Northwest, Washington, D. C. The lease was for a term of three years with a right to renew for a term of five years at a rent not to exceed $1,000 per month, provided "that the lessor still occupies the premises as a tenant of the owner." Prior to this, the same parties had been participants in two other leases concerning the same premises, these earlier leases each containing a renewal clause which had been abandoned by the parties as the successive leases were executed. At the time of entering into lease No. 3, appellants, on reading the proviso quoted above, first became aware that Valet, Inc., was not the owner of the premises, but was a tenant of the owner. The fact was, although appellants did not learn of this until later, that Goda had leased the premises from the owner and had then assigned the lease to Valet, Inc., a corporation owned and controlled solely by him. Although there was a conflict of testimony on the point, the trial court found that the parties did discuss the clause prior to the execution of lease No. 3.

Some fourteen or fifteen months before lease No. 3 was to expire, appellant Jack Sekulow contacted appellee Goda and told him appellants were ready to exercise the renewal option and attempted to set a rental for the five year term. Goda delayed taking action on the grounds that it was too early to talk about it and that there was plenty of time.

The events following are set out by the trial court in his findings of fact: "During the summer of 1944, there were numerous conversations between plaintiff, Jack Sekulow, and defendant, Goda, concerning the renewal clause and in the latter part of August, 1944, Goda stated that rather than renew with plaintiffs at a rental not to exceed $1,000.00 per month, the corporation would forego the renewing of its lease with the owner, because he was not making any money out of it. Lease No. 3, by its terms was not to expire until July 30, 1945; there were some further conversations, and Goda testified he entered into a verbal agreement with the plaintiff, Jack Sekulow, that Lease No. 3 was to be released and a new lease entered into, commencing September 15, 1944, and ending on September 30, 1950. The plaintiffs deny that there was any such agreement. The defendant Goda, through his attorney on September 8, 1944, mailed to the plaintiffs a copy of a new proposed lease, in which letter the attorney further stated that the matter had to be consummated not later than September 15. The plaintiffs sought an extension of time, which was refused."

Accordingly, appellant Jack Sekulow and his attorney met with appellee Goda and his attorney in the latter's office in Washington on September 15, 1944. Sekulow made an effort to discuss the terms of the proffered lease, but was told by Goda that if he was not going to sign the lease under the listed rentals there was nothing to discuss. Appellants then entered into a release of lease No. 3 and executed lease No. 4 running from September 15, 1944 to September 30, 1950, which provided for rent in excess of $1,000 per month.

In the meantime, on September 7, 1944, Goda had exercised a renewal option contained in his lease with the owner of the premises, extending the term until September 30, 1950. While appellants did not know of this prior to the meeting in Washington on September 15, 1944, there was attached to lease No. 4 a letter dated September 7, 1944, from the owner to Goda permitting Goda to sublease to Sekulow Brothers "for a term not to exceed the expiration date of your lease with us for the premises namely Sept. 30, 1950," which letter was seen by appellant Jack Sekulow

prior to the time lease No. 3 was released and lease No. 4 was executed.

The court further stated in his findings of fact "that the parties were dealing at arm's length, that there was no duress, threats of eviction or undue influence. * * * That there was not even what amounts to extreme business compulsion, inasmuch as on September 15, 1944, the plaintiffs' lease still had almost nine months to run. They were then represented by counsel and are presumed to have known that they could have enjoined Goda from renting to any other party if he renewed his own lease. The Court further finds that there is no ambiguity in the phrase, 'provided the lessor still occupies the premises as a tenant of the owner,' and that the defendants were at perfect liberty not to renew their option if they chose not to do so. On the contrary, the Court finds that the plaintiffs in order to assure themselves of the continued use of the premises at the expiration of lease No. 3, which would be certain only in the event that the sublessor renewed his master lease, voluntarily executed the release of lease No. 3 and entered into sublease No. 4 at terms which, although not as favorable as they wished, were accepted by them."

As we have above indicated, appellants sought to have lease No. 4 cancelled, to have lease No. 3 reinstated, and to recover back money paid to appellees under lease No. 4.

Appellants allege as error the findings of the trial court that the parties were dealing at arm's length, that there was no duress, threats of eviction or undue influence, nor what amounts to business compulsion, that the plaintiffs voluntarily executed the release of lease No. 3 and voluntarily executed lease No. 4, that the defendants were at liberty not to renew their option if they chose not to do so, that the option provision did not create an absolute right on the part of the plaintiffs, and that there was consideration for the execution of the release of lease No. 3 and for the execution of lease No. 4. In addition, they assert the following conclusions and generalities which they believe apply to the facts: (1) that appellees' action constitued fraud; (2) that it constituted business duress; (3) that a fiduciary relationship existed under the parties' relationship of landlord and tenant; (4) that the renewal provision required Goda to act in good faith to remain a tenant; (5) that their option right became effective when Goda renewed the master lease; and (6) that a corporation cannot be used as a cloak to perpetrate or protect a fraud.

There is little we can add to the findings of fact of the trial court and his conclusions of law based thereon, which were that there was neither duress nor fraud, that the option proviso was explicit and unambiguous, and did not create an absolute right on the part of appellants, nor a duty on the part of appellees to renew the lease with the owner, and that there was consideration for the execution of the release of lease No. 3 and for the execution of lease No. 4. The findings of fact are supported by ample evidence and not clearly erroneous and thus are binding on this court,[1] and the court's conclusions of law are in complete accord with our views.

The evidence shows that appellants were experienced business men and as such stood on an equal footing with Goda in their business dealings with him. This being so, and for the further reason they were represented by counsel, it must be assumed they knew of their rights existing under lease No. 3, that their right to renew became absolute when Goda extended the term of his lease with the owner,[2] and that such right was enforceable in equity by a suit for specific performance.[3]

The condition imposed on appellants' renewal option making it effective only if the lessor remained as a tenant of the owner was for the benefit of appellees, permitting them to escape from the terms of the lease provided they were in no position, or felt they were in no position, to exercise their own renewal option with the owner and continue as tenants for an

---

[1] Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

[2] cf. Hotel Allen Co. v. Allen's Estate, 117 Minn. 333, 135 N.W. 812.

[3] International Exchange Bank v. Pullo, 52 App.D.C. 199, 285 F. 933.

extended term. Adopting appellants' view that appellees were bound to remain as tenants of the owner solely for the reason that appellants had an option to renew would render the terms of the condition worthless and superfluous. We hold that appellees were under no duty to continue on as tenants at the expiration of their own lease solely to benefit appellants, and it was only when appellees did renew their master lease that appellants' right to renew lease No. 3 became absolute. Their failure to stand on this right and require performance rather than concede to Goda's demands is the cause of this litigation.

■ Appellants assert that Goda's action in concealing from them his contractual rights with the owner, and in stating that he was not making money, constitutes fraud. We fail to see wherein Goda was obligated to divulge to appellants his business dealings with a stranger. Appellants and appellees were associated in a straight business transaction involving a lease agreement and nothing further was required than strict compliance with the obligations thereby imposed. Divulgence of independent business transactions was not one of these obligations. We here reject the argument presented by appellants that a fiduciary relationship exists between landlord and tenant. The assertion that Goda falsely stated he was not making money stands unsupported because, while the record discloses that the rentals Goda received from subleasing the property were materially higher than the rental he in turn paid the owner, the record further shows that he was under obligation by the terms of the master lease to take care of the light, heat, service charges and repairs of the premises.

■ Neither do we find support for appellants' contention that the existing circumstances constitute business duress or business compulsion. This court has never had occasion to recognize the doctrine of business compulsion,[4] which is a comparatively modern innovation in the field of duress. Because the application of the doctrine depends on the facts of the individual case it has not been confined to firm boundaries. The general rule, however, as stated in Annotation, Doctrine of "business compulsion", 79 A.L.R. 655, is: "It seems to be established as a general rule, at least in this country, that the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract." (Citing cases). We think the instant facts do not constitute business compulsion for two reasons, the first, because appellants had adequate means to enforce their rights by resorting to a suit for specific performance, and second, because nine months remained before their lease ran out which alleviated any necessity for instantaneous action on their part in acquiescing to the demands of Goda. Furthermore, the position is generally taken that the threatened act which is the motivating force causing the party aggrieved to enter into the transaction sought to be avoided must by its nature be a wrongful act.[5] Such was not the case here, since Goda was legally justified in refusing to renew his lease with the owner. And while it may be said that Goda took an advantage of appellants, and drove a hard bargain, his action did not constitute business duress or business compulsion.[6]

■ The trial court found "that there was consideration for the execution of the release of lease No. 3 and for the execution of lease No. 4." With this we agree. There was evidence before the court that prior to September 15, 1944, Goda and Jack Sekulow entered into an agreement that Goda would extend his master lease, which he was not bound to do, provided lease No. 3 was released and a new lease entered into. In addition, Goda gave appellants written permission to sell handbags which they did not have in lease No. 3, and Goda consented to record the master lease and also lease No. 4. Further, there was attached to lease No. 4 a letter by the owner to Goda per-

4 Compare Hill v. District of Columbia, 1889, 18 D.C. 481, 7 Mackey 481.

5 5 Williston on Contracts, Rev.Ed., §§ 1603, 1605, 1606.

6 Sistrom v. Anderson, 51 Cal.App. 213, 124 P.2d 372. cf. Hartsville Oil Mill v. United States, 271 U.S. 43, 46 S.Ct. 389, 70 L.Ed. 822.

mitting him to sublease to appellants. This is ample evidence on which to base a conclusion that there was consideration, and the trial court did not err in so finding.

The two remaining contentions presented by appellants, that any uncertainty in a lease agreement is to be construed against the lessor and in favor of the tenant, and that a corporation cannot be used as a cloak to perpetrate or protect a fraud, while both supported by considerable authority, are of no avail here, the first because no uncertainty or ambiguity in the lease agreement exists, and the second because there has been no fraud.

Affirmed.